UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(Hartford)

-----------------------------------------------------:
                             :

THE CADLE COMPANY,         :    CIVIL ACTION NO.
       Plaintiff            :    3:02-CV-30 (TPS)
                             :

v.                             :
                             :

DOUGLAS WHITE  and        :
ROSALIE A. WHITE,          :
       Defendants        :
-----------------------------------------------------:    February 3, 2006

## PLAINTIFF'S POST-TRIAL MEMORANDUM

**I.    Introduction.**

      The Plaintiff, The Cadle Company ("Cadle" or "Plaintiff"), hereby submits its Post-Trial

Memorandum to assist the court in deciding the merits of the trial in this civil action.  The parties

entered into an extensive stipulation of facts, which is contained within the Joint Trial

Memorandum dated August 13, 2004 on file with this court, and is hereinafter referred to as the

"Stipulation").  The Stipulation will be reproduced herein for ease of reference.  The parties also

stipulated to the admissibility of all of the exhibits, except for seven exhibits, and all of those

exhibits now form a part of the evidentiary record, together with four of the seven exhibits to

which an objection was interposed but overruled at trial.  The exhibits that are thus full exhibits

422251v8

in the evidentiary record are exhibit nos. 1 – 44, inclusive, and 52 – 55, inclusive. Therefore, most of the material facts are not in dispute and are collectively contained in the Stipulation and/or are readily found from a review of the admitted exhibits. The dispute surrounds only a few issues of material fact and the legal significance of the facts.

The Complaint is made in three counts and asserts the liability of both the transferor and transferee for fraudulent transfers pursuant to Connecticut's embodiment of the Uniform Fraudulent Transfer Act (the "Act" or "UFTA"), codified at Connecticut General Statutes §52-552a through 52-552l, inclusive. Plaintiff, a judgment creditor of the defendant-transferor, Douglas White, seeks to establish the liability of both the transferor and the transferee Rosalie White a/k/a Lee White, and seeks, by way of relief, *inter alia*, money damages against the transferee, the avoidance of transfers and an injunction against further transfers. Inasmuch as the transfers are comprised of the negotiation by defendant Douglas White of instruments, specifically, so-called commission checks, to defendant Rosalie White over a period of years, the principal relief sought is a money judgment against the defendant transferee, Rosalie White a/k/a Lee White, with respect to all such prior transfers, together with an injunction against the defendants prohibiting any and all like transfers in the future.

There are three general statutory bases for the action, §52-552e (a)(1), §52-552e (a)(2) and §52-552f. Count One, brought under Connecticut General Statutes §52-552e (a)(1),

requires the plaintiff to establish, as to each challenged transaction for which recovery is sought, that the transaction constituted a "transfer" of an "asset" (both statutorily defined terms) by the defendant-transferor with an actual intent by the defendant-transferor, Douglas White, to hinder, delay or defraud one or more of his creditors. Plaintiff seeks, by way of relief, *inter alia*, money damages against the transferee, the avoidance of transfers and an injunction against further transfers.

Count Two, brought under Connecticut General Statutes §52-552e(a)(2), requires the plaintiff to establish, as to each challenged transaction for which recovery is sought, that the transaction constituted a "transfer" of an "asset" by the defendant-transferor, that was made without defendant Douglas White (the transferor) receiving reasonably equivalent value in exchange therefor, and at a time when (i) he was engaged or about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction or, alternatively, (ii) he intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. Plaintiff seeks, by way of relief, *inter alia*, money damages against the transferee, the avoidance of transfers and an injunction against further transfers.

The Third Count, brought under Connecticut General Statutes §52-552f, requires the plaintiff to establish, as to each challenged transaction for which recovery is sought, that the

transaction constituted a "transfer" of an "asset" by the defendant-transferor, that was made without defendant Douglas White (the transferor) receiving reasonably equivalent value in exchange therefor, and that defendant Douglas White was insolvent at the time of such transfer or became insolvent as a consequence of such transfer.  Plaintiff seeks, by way of relief, *inter alia*, money damages against the transferee, the avoidance of transfers and an injunction against further transfers.

For the reasons set forth more fully herein, judgment should enter in favor of the Plaintiff and against Defendant Rosalie White a/k/a Lee White for the full amount of the outstanding judgment debt (see paragraph 7 of Stipulation for the judgment amount – as of August 9, 2004 the sum of $562,776.62, to which a per diem rate of $88.29 is applied for the 533 days elapsed since the date of the Stipulation, yielding a total judgment amount as of February 3, 2006 at $609,835.19).

## II.     The Stipulated Facts.

The Joint Trial Memorandum contains the following stipulation of facts (the "Stipulation") which is reproduced herein verbatim:

The parties hereto, for the purpose of the trial on the merits of this case, hereby stipulate to the following facts.  It is expressly understood that these facts are to be found by the court without the need of presentation of evidence.  The parties hereto have diverse contentions as to

whether and, if so, what, other and further facts may be reasonably inferred from the stipulated facts. The Court should not view this stipulation as prohibiting the Court from making such inferences from the stipulated facts as it determines to be reasonable; nor does this stipulation prohibit the Court from making other and further factual findings based upon any such reasonable inferences. In addition to the foregoing, the parties each reserve the right to present evidence at trial to support other and further factual findings by the Court. The stipulated facts are as follows:

1.     Plaintiff, The Cadle Company ("Cadle"), is an Ohio corporation with its principal place of business at 100 North Center Street, Newton Falls, Ohio.

2.     Defendant, Douglas C. White ("Douglas White") is an individual residing at 53 Flat Rock Hill Road, Old Lyme, Connecticut.

3.     Defendant, Rosalie A. White ("Rosalie White") is an individual residing at 53 Flat Rock Hill Road, Old Lyme, Connecticut.

4.     This Court has jurisdiction over this action by virtue of the diversity of citizenship between the parties pursuant to 28 U.S.C. Section 1332. The amount in controversy exceeds the sum of $75,000.00.

5.     Venue is proper in this district pursuant to 28 U.S.C. Section 1391 because the defendants reside in this district.

422251v8

6.    Plaintiff is the judgment creditor of defendant Douglas White by virtue of, and pursuant to the terms and provisions of, a certain final judgment entered in a civil action formerly pending in the Superior Court for the Judicial District of Windham at Putnam, which civil action became known as The Cadle Company v. Glen Falls Realty Partnership, et al and bearing civil action number CV-96-0053687-S, which judgment was entered on or about April 21, 1997 in the amount of $317,854.10, which includes costs, interest, taxes and additional fees (hereinafter collectively referred to as the "Judgment").  The indebtedness with respect to which the Judgment relates pre-dates 1991.

7.    To this date, the Judgment remains unsatisfied, and, as of the present time, the Judgment, plus post-judgment interest from and after the entry of the Judgment up to and including the present time, remains due and owing to The Cadle Company from Douglas C. White.  The accrued interest on the Judgment, as of August 9, 2004, is the sum of $244,922.52, to which additional interest continues to accrue at the per diem rate of $88.29.  Thus, the amount of the outstanding judgment as of August 9, 2004 is the sum of $562,776.62, to which a per diem rate is applied from and after August 9, 2004.

8.    Defendant Douglas White and defendant Rosalie White are husband and wife, respectively.

9. Defendants Douglas White and Rosalie White are not estranged, one from the other, and they currently live together as husband and wife, and have so lived together before and after the entry of the Judgment through and including the present time.

10. The defendant Douglas White is a manufacturer's representative, a sole proprietor who earns money solely on a commission basis from the various companies that he represents. These commissions are paid to Douglas White periodically by means of a check payable to the order of Douglas White in the amount of the earned commission. Upon receipt of most of his commission checks, Douglas White endorses and delivers the commission check over to his wife, defendant Rosalie White (a/k/a Lee White). He retains and deposits the other checks into his own checking account (which is a joint account).

11. Defendant Rosalie White deposits the endorsed commission checks into her checking account, an account maintained solely in her name and over which defendant Douglas White has no signatory authority (which account, over the years, has been maintained first with The Washington Trust Company and, thereafter, with Liberty Bank).

12. The foregoing check negotiation and deposit pattern has continued, on an uninterrupted basis for a time prior to 1991, and has continued up through and including the present time.

13.  Defendant Rosalie White uses the money in said account, in part, to pay the defendants' respective and collective everyday living expenses of their common life together, which payments are made by checks drawn by her on said account.  In addition thereto, most of the defendant-transferor's business expenses for his sole proprietorship are paid by the defendant-transferee, Rosalie White (a/k/a Lee White), by means of checks drawn by her on her aforesaid personal bank account, with defendant Douglas White writing personal checks on his checking account for only a modest amount of his overall business expenses.  Thus, the proceeds of the commission checks are, with a few minor exceptions, used by the transferee for those two purposes.

14.  The amount of the commission checks so endorsed and delivered by defendant Douglas White to defendant Rosalie White occurred throughout each year in question.  The account records of the bank accounts of defendant Rosalie White (a/k/a Lee White) with The Washington Trust Company and Liberty Bank, together with her testimony (and/or the stipulated facts), and the photocopies of the commission checks deposited into her account and thus presented for collection by defendant Rosalie White (which copies were produced by said banks in many cases), collectively detail the frequency and amount of the commission checks endorsed and delivered to Rosalie White by Douglas White, and itemize the same.

15. In the mid-1980s, defendant Douglas White owned a corporation with several other individuals. The shareholders then decided to form a partnership to purchase a new location to house the business facilities (Glen Falls Realty Partnership), which real property purchase was financed with a purchase money loan secured by a mortgage on the business premises. The defendant Douglas White was an obligor on the corporate and real estate debt.

16. The nature of the business was the packaging of products for and on behalf of manufacturers, which products would be packaged at the facility. The Company closed its doors for good by the early 1990s. The real property that housed the business was foreclosed and a deficiency judgment was entered in connection therewith, which is the judgment on which the plaintiff's creditor status rests.

17. Prior to moving to Connecticut, the defendants owned successive residences in Massachusetts, which residences were always titled in their names jointly. Approximately one year after starting the company, the couple moved to Connecticut, to the real property commonly known as 255 Cemetery Road, Canterbury Connecticut. This property, into which the equity from the sale of the Massachusetts' home was put, was conveyed to defendant Rosalie White alone. Defendant Douglas White's salary was used in substantial measure to pay the mortgage debt.

18.  In 1998 the house was sold by the Trust and the proceeds thereof were used to purchase the couple's current residence, 53 Flat Rock Road, Old Lyme, Connecticut.  For a period of time Rosalie White's parents resided at that address.  Title was taken in the name of the trust, the trustee of which is defendant Douglas White's sister (no relation to the settlor of the trust and the sister-in-law of trust beneficiary defendant Rosalie White).

19.  From at least 1997 through and including the present time, the defendant Douglas White has held no real property in his name, no financial investments in his name, and only very modest items of personal property.  The only other items of personal property that he may have are the contingent fee commissions (i.e., the contract to receive a commission if the customer for the item fully pays the manufacturer therefor, at which point in time the fee commission is paid to defendant Douglas White and then paid over by him to defendant Rosalie White).  The amount of such contingent claims is negligible when compared to his liabilities.  Throughout this period of time, Douglas White's liability to Cadle Company and its predecessors exceeded his assets.

## III.   Additional Material Facts Adduced From The Trial Exhibits and Testimony.

In addition to the facts set forth in the Stipulation, the following additional facts should be found from the trial exhibits and testimony:

A.  <u>The Asset Transfers</u>.

There are two time periods germane to this proceeding, depending on which count of the Complaint is being adjudicated.  The First Count seeks relief with respect to transfers of assets from 1991 through the date of the commencement of the action and times subsequent thereto. The Second and Third Counts seek relief with respect to transfers of assets from a date in time starting with four years prior to the commencement of the action, through the commencement date and times subsequent thereto.  The Complaint was served on January 24, 2002[1], which pegs the four-year look back period for constructively fraudulent transfers as January 24, 1998 through January 24, 2002.  Plaintiff's Exhibit 52 is an itemized summary of Doug White's commission checks (and certain other items issued to him) that were transferred to Lee White and deposited into Lee White's bank accounts with Washington Trust and Liberty Bank for 1996 through early 2002, on a monthly basis.  Each deposit is broken down in Exhibit 52 by date, total deposit amount and the dollar amount of the commission check component.  As is shown by a review of pages three through seven of Exhibit 52, the dollar amount of the commission check deposits during for the four-year look back period of the Second and Third Counts is the sum of

---

[1] In Diversity cases, for statute of limitations purposes, the action is deemed to have been commenced on the date when service of the complaint was made, not on the date when the complaint was filed.  <u>Slekis v. Amtrak</u>, 56 F. Supp. 2d 202, 205 (D. Conn. 1999).

$251,922.66, and the deposits from and after that point in time are another $39,213.79, for total commission deposits of $291,136.45 under the Second and Third Counts of the Complaint. The First Count of the Complaint, the one alleging intentional fraud, includes within its timeline the above referenced transfers of $291,136.45, plus other and further transfers for the years 1991 through 1997, inclusive. Exhibit 52 has the dates, dollar amounts of deposits, and dollar amounts of commission check components of the deposits into Lee White's bank account for the years 1996 and 1997. They are in the respective amounts of $45,508.88 and $94,611.03. There are no bank account records pre-dating 1996, as the same were unavailable through discovery; however, Doug White testified that his annual commission income for the years 1991 through 1995 was between $50,000 and $70,000.00 (Tr. at 22), as to which commission checks he transferred most of said sums to his wife for her to deposit in her own bank account. See Stipulation, and Exhibit 4, 1/21/03 Tr. at 50-51, and Trial Tr. at 51. Thus, factoring in a moderate retention of $10,000.00, at least $40,000.00 per year in commission checks were transferred to defendant Lee White during the years 1991 through 1995, for another $200,000.00 in transfers. Thus, the total amount of the transfers under the First Count of the Complaint is $631,256.36.

B.  The Absence of Anything Received in Exchange for the Transfers.

Doug White received nothing in return for the transfer of his commission checks to his

wife. Exhibit 4 (1/21/2003 Tr.) at pp. 96-98.  So too, he was not indebted in any way to his wife.

Tr. at 71.  Instead, his wife makes use of those monies, in the exercise of her discretion.  Exhibit

4 (1/21/2003 Tr.) at 98.  As stated in the Stipulation, what Lee White does with the money is she

uses it to pay her and Doug White's respective and collective expenses of their common life

together, and she also uses portions of the money to pay the preponderance of the expenses of

Doug White's business.

Plaintiff disputes that the concept of "use" by the transferee, of the transferred assets,

reasonably can come within the meaning of "value," as said term is defined in the Act, even

when such use, in substantial measure, somehow benefits the transferor (such as by paying the

transferor's business expenses).  However, if the Court were inclined to so construe that

statutorily defined term, the testimony showed that certain credit cards that were paid out of

funds from those accounts were used exclusively by Lee White, and that the checks written on

those accounts to stores and businesses were for purchases that Lee White made.  Tr. at 48-49.

Doug White only used the Chase Visa, American Express, the Home Depot card and the gasoline

credit cards, all other credit cards were used exclusively by Lee White.  Id.; see also, Exhibit 3

(Lee White Deposition) at 143-144 (attesting to Lee White's exclusive control and use of all but

a few credit cards). The exhibits that detail the credit card bills (Exhibits 37-40), together with the bank account statements (Exhibits 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, and 35), the commission deposit summary (Exhibit 52) and the cancelled checks written against Lee White's bank accounts (Exhibits 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34 and 36), all of which are of record in this case, permit one to quantify and trace all of those transactions and to determine, with specificity, how much of the commission deposits were used to pay bills for credit cards used exclusively by Lee White. This would be a painstaking task, but it can be done from the evidentiary record, although, due to the commingling of funds, the court would need to determine whether to use the "FIFO" (First In, First Out), "LIFO" (Last In, First Out), or some other accounting method in determining the timing of the use of the commingled funds.

     C. The Badges of Fraud.

     The following facts from the evidentiary record, when viewed in conjunction with the Stipulation, are germane to the so-called "badges of fraud," and/or are otherwise probative of the intent to hinder, delay or defraud a creditor – matters germane to the First Count only. Before Doug White's business failed, in or about 1990, he took out two business loans to try and keep the company afloat, which loans were guaranteed by Lee White and which were secured by mortgages on the couple's Canterbury residence (which residence, as set forth in the Stipulation, was titled in the name of Lee White). Tr. at 15-16. At that time Doug White had no other

financial resources. Id. at 17-18. When the company failed in 1990 and thereafter, Doug White had no meaningful assets in the world, just the modest contents of his home, and the ability to earn a living as a manufacturer's representative. Id. at 17-23.

In 1993, the Canterbury residence was transferred to the Anne Fieldman Trust, for the sum of $213,500. See Exhibit 53 (deed of conveyance). The proceeds of the sale were used to pay off the mortgages on the house and also put substantial monies into Lee White's name. Tr. at 66-67. Anne Fieldman is the late aunt of Lee White. Exhibit 2, Tr. at 55-57. The trustee of the Anne Fieldman trust is Doug White's sister (Lee White's sister-in-law and no relation to Anne Fieldman). Tr. at 46-47. In his 2003 deposition, Doug White claimed to not know who was the trustee of the Anne Fieldman trust, but when confronted with examiner's knowledge that the trustee was his own sister, he then testified that there are two Anne Fieldman trusts and he did not understand to which trust the examiner was referring. Exhibit 4 at 75.

Within two weeks of the 1993 transfer, Lee White, purportedly acting as the agent of the Anne Fieldman trust, listed the property for sale for the sum of $297,000, some $83,000.00 more than the sum for which the house was "sold" to the Anne Fieldman Trust. Exhibit 54. A few months later a contract was entered into, also by Lee White on behalf of the trust, to sell the house for $275,000.00, Exhibit 55, although that contract fell through and they actually lived there another four to five years. Tr. at 31-32.

As the Stipulation establishes, the Canterbury house was sold in 1998, and the Whites then moved into their current residence at 53 Flat Rock Road in Old Lyme. The Whites live there ostensibly as "custodians." Tr. at 32-37. They pay no compensation to the trust that holds title of record to the house. Id. They rent out an apartment on the premises to a tenant and make use the rental proceeds. Id. Douglas White has collected rental checks directly from the tenant, made payable to his order. Id. For years, Douglas and Lee White insured the Flat Rock home in their names as the owners thereof, insuring the building in their names for approximately $300,000.00. Tr. at 37-40. They stopped doing that only after said point was raised in a deposition in this case. Id.

In 1997, proximate in time to the entry of the deficiency judgment in favor of The Cadle Company, Douglas White found a used 35' sailboat that he liked and came to an agreement with the seller for the purchase of the sailboat. Tr. at 40-47. He commissioned a survey to determine the structural integrity of the sailboat, signing his own name to a check drawn on Lee White's checking account to pay for the same. Id. The $5,000.00 down payment for the boat was paid by check drawn on Lee White's checking account into which the commission checks are deposited. Id. Title to the sailboat was taken in the name of Lee White's then 91 year old mother, although the defendants are, and have been, the principal users of the boat and the aged mother went on the boat only a handful of times. Id. The taxes and license fees are paid by

Doug White. Id. Douglas White has testified previously that Lee's mother wanted the boat for herself, to get into boating when she was ninety-one. Exhibit 4 at 61-65. Finally seeing that such an explanation was implausible, Doug White later claimed that Lee White's mother wanted to make a gift of the boat to them. Tr. at 40-47.

Doug White received commission checks from one manufacturer that he represents, but at least two of those checks were initially made payable to the order of Lee White, when she had nothing to do with the earning of the commission. Tr. at 51-56. Doug White claims that the manufacturer took it upon himself to make the check payable to Lee White's order, and that he had nothing to do with that payment arrangement. Id. He surmised that the same might be because of tax problems that he believed the manufacturer was having, id.; however, the record shows that the Whites themselves had significant tax problems – they did not file a federal tax return for five consecutive years – 1997 through 2001, inclusive, Exhibit 2 at 82 (yet Doug White testified that he believed his finances were in order before the deficiency judgment entered in 1997, Tr. at 70, and that he was conducting his affairs in such a way that he was not incurring debts that he could not cover, id.). Doug White actually invoked his Fifth Amendment right against self incrimination when questioned about whether he paid income taxes for 1997-2001, inclusive, and whether he filed tax returns for those years. Exhibit 4, 1/21/03 Tr. at 5-7.

Doug White claimed at trial that Lee White maintained a separate bank account since the early 1980's or before, although he claims initially that they had joint accounts and he was not sure when or why Lee changed to an account only in her own name. Tr. at 78-82. Yet, at his examination of judgment debtor in 2001, Exhibit 2, Doug White testified that he believed he and his wife had a joint bank account when they lived in Massachusetts. Exhibit 2 at 66. They moved to Connecticut in 1986. Trial Tr. at 61. Doug White testified in his 2001 deposition that he had "no idea" when Lee White ceased having a joint bank account with him and banked only in her name; that he did not know whether that separate account relationship predated the sale of the Canterbury home (which the record shows as having sold in 1993 – Exhibit 53). Exhibit 2 at 66-67. Lee White herself does not know whether she had a bank account in her own name, as opposed to a joint account with Doug White, before 1991. Exhibit 3, Lee White Dep. Tr. at 32-33. They have no records to bolster Doug White's claim that such a pattern of conduct predated 1991. Trial Tr. at 81-82.

Doug White's testimony as to his assets and liabilities establishes that he was insolvent from 1991 to the present (the Stipulation establishes insolvency from at least 1997 through the present). Tr. at 15-23. Doug White testified that he had no meaningful assets in his name from and after 1991 and that he had no more financial resources when the business failed in 1990 and thereafter. Id.

Lee White knew of her husband's business failure in 1991, Exhibit 3 at 27, and was aware of their financial situation, as she managed the books for Doug's business and the household (see Stipulation and Tr. at 50). She was well aware that in 1993 (when the Canterbury house was sold) that Doug White's financial circumstances were poor. Exhibit 3 at 48.

## IV.    **Burden of Proof.**

The Plaintiff's burden of proof on the First Count of the Complaint, the same being for intentional fraud, is clear and convincing evidence. See, J. Frederick Scholes Agency v. Mitchell, 191 Conn. 353, 358-59 (1983), and Alaimo v. Royer, 188 Conn. 36, 39 (1982). Although the law is not entirely clear on this point, it appears that the burden of proof on Lee White's "good faith and reasonably equivalent value" defense is only the ordinary civil standard preponderance of the evidence.

The burden of proof in establishing good faith falls upon the transferee seeking to invoke the defense. See Quantam Sail Design Group, LLC v. Liberty Enterprises, Inc., 2004 U.S. Dist. LEXIS 9679 at *9-10 (D. Conn. Mar. 26, 2004); Uni. Fraudulent Transfer Act § 8 cmt. 1, 7A U.L.A. 352 (1998) (copy attached). This rule is contrary to the old Connecticut common law rule, which required plaintiffs to affirmatively prove the transferee's actual knowledge and participation in the fraud in order to establish the basis for avoidance. See, e.g., Knower v. The Cadden Clothing Co., 57 Conn. 202 (1889); Burakowski v. Grustas, 134 Conn. 205 (1947).

There appears to be no caselaw, either within Connecticut or from other jurisdictions interpreting the UFTA, that states the standard of proof applicable to the transferee's burden of proving good faith. In spite of the lack of direct authority, there are sufficient factors pointing in the direction of the preponderance of the evidence standard to conclude that it is the applicable standard. First, under Connecticut law, when a court does not specify the evidentiary standard it has applied, there is a presumption that it has applied the preponderance of the evidence standard. See State v. Davis, 229 Conn. 285, 302-03 (1994). This speaks to preponderance of the evidence as being the customary standard. Second, there is no compelling reason to assume that the heightened evidentiary standard applicable to one aspect of a statute applies throughout the statute or to the corresponding affirmative defenses. Under the Connecticut Penal Code, for example, the prosecution must meet the beyond a reasonable doubt standard, whereas the defendant can prove an affirmative defense by simply meeting the preponderance of the evidence standard. Conn. Gen. Stat. § 53a-12(b). More pointedly, within the context of the Uniform Fraudulent Transfer Act, the heightened standard for proving fraud does not apply to the element of damages, indicating the absence any need for uniformity throughout the statute. See Kilduff v. Adams, 219 Conn. 314, 330 (1991). For these reasons, the the preponderance of the evidence test is more likely to be the applicable standard than is the clear and convincing test with respect to Lee White's affirmative defense to the intentional fraud count (First Count).

With respect to the Second and Third Counts, sounding in the nature of constructive fraud, and not intentional fraud, the Plaintiff submits that the proper burden of proof on its case-in-chief is preponderance of the evidence, although Plaintiff maintains that the evidence nonetheless also would satisfy a clear and convincing evidence burden.  Plaintiff acknowledges that the burden of proof for constructive fraud under the Act is a dicey question.  A Connecticut Appellate Court decision holds to a clear and convincing evidence standard for such claims. Patrocinio v. Yalanis, 4 Conn. App. 33, 35 -36 (1985).  However, this case has its foundation on Supreme Court cases that dealt with intentional fraud, which requires scienter.  See, J. Frederick Scholes Agency v. Mitchell, 191 Conn. 353, 358-59 (1983), and Alaimo v. Royer, 188 Conn. 36, 39 (1982).

The correct standard of proof for constructive fraud is ripe for reconsideration because scienter is not an element; instead, it is the making of a transfer for less than reasonably equivalent value at a time when the transferor was insolvent or where he was thereby rendered insolvent.  There is no strong, overriding policy consideration that weighs in favor of using a standard more exacting than the customary civil standard when dealing with constructive fraud. Indeed, the more heightened standard of proof is applied in cases such as the acquisition of title by adverse possession, the termination of parental rights, libel, fraud, or reformation of a deed or contract.  Kavarco v. T.J.E., Inc., 2 Conn. App. 294, 296 (1984).  Special policy reasons explain

why the burden of proof is heightened in such cases, such as the taking away of property granted

by deed (adverse possession), termination of parental rights (one of the most fundamental rights

on this earth), establishing that the parties meant something other than what they said in a written

contract (reformation) (and where the litigants obviously dispute that there was any such

different intent), and fraud (the scienter requirement makes fraud the civil equivalent of serious

criminal conduct, with very serious implications for one's reputation, the goodwill of one's

name).  Constructive fraud simply does not have that taint, as its elements do not have any such

connotation of criminal culpability.  Accordingly, the proper burden of proof on the Second and

Third Counts for constructive fraud should be mere preponderance of the evidence.  Cf., Bay

State Milling co. v. Martin, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992), appeal dismissed 151

B.R. 154 (N.D. Ill. 1993) (opining that the preponderance of the evidence standard applies to the

plaintiff's case-in-chief on a claim of constructive fraud under Illinois' version of the UFTA).

## V.    Law and Argument.

### A.  The First Count: Transfer of Assets with Fraudulent Intent.

The First Count of the Complaint seeks to establish the liability of defendant Rosalie

White a/k/a Lee White, as transferee, for the intentionally fraudulent transfers of her husband's

(defendant Doug White's) property.  In addition to seeking an award of money damages against

defendant Lee White, plaintiff seeks a court order enjoining defendant Doug White from making any further transfers of property to Lee White.

### 1. **The Statutory Principles.**

The First Count, as with all other counts of the Complaint, is a statutory cause of action. The governing statute is Conn. Gen. Stat. Sec. 52-552e (a) (1) and (b), and they provide, in pertinent part, as follows:

> A transfer made or obligation incurred by a debtor is fraudulent to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor.

> In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Certain of the words used in this statute are defined within the UFTA itself. The UFTA defines the term "asset" to mean "property of a debtor" (with certain exceptions not here relevant). Conn. Gen. Stat. Sec. 52-552b (2). The UFTA defines the term "property" to mean "anything that may be the subject of ownership." Conn. Gen. Stat. Sec. 52-552b (2). The UFTA defines the term "debtor" to mean "a person who is liable on a claim." Conn. Gen. Stat. Sec. 52-552b (6). The UFTA defines the term "claim" to mean "a right to payment whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Conn. Gen. Stat. Sec. 52-552b (3) and (4). The UFTA defines the term "creditor" to mean "a person who has a claim." Conn. Gen. Stat. Sec. 52-552b (4). The UFTA defines the term "transfer" to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." Conn. Gen. Stat. Sec. 52-552b (12). The UFTA further provides that a transfer is made "with respect to an asset that is not real property or that is a fixture, when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under sections 52-552a-52-552l, inclusive, that is superior to the interest of the transferee." Conn. Gen. Stat. Sec. 52-552g.

In terms of the remedies provision of the Act, there are two pertinent provisions: Conn. Gen. Stat. Sec. 52-552h and Conn. Gen. Stat. 52-552i. The former provides, in pertinent part, as follows:

> In an action for relief against a transfer or obligation under sections 52-552a to 52-552l, inclusive, a creditor, subject to the limitations in section 52-552i, may obtain: (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; ... (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property ... or (C) any other relief the circumstances may require.

The latter statute provides, in pertinent part, as follows:

> Defenses, liability and protection of transferee:
>
> (a) A transfer or obligation is not voidable under subdivision (1) of subsection (a) of section 52-552e against a person who took in good faith and for a reasonably equivalent value.
>
> (b) [T]o the extent a transfer is voidable in an action by a creditor under subdivision (1) of subsection (a) of 52-552h, the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against: (1) The first transferee of the asset or the person for whose benefit the transfer was made. . . .
>
> (c) If the judgment under subsection (b) of this section is based upon the value of the asset transferred, the judgment must be for an