> amount equal to the value of the asset at the time of the transfer,
> subject to adjustment as the equities may pertain.

Id.

### 2. The Commission Check Transactions Each Constitutes A Transfer of An Asset That Plaintiff Has Claimant Status to Challenge.

Based on the foregoing statutory definitions, the Stipulation, and the other facts clearly supported by the evidentiary record: (a) plaintiff Cadle is a "creditor" of defendant Douglas White (having a "claim" against him), and Douglas White is a "debtor" of Cadle (liable on such claim), and they have been so, respectively, ever since a point in time before 1991, because the outstanding indebtedness owed by Douglas White to Cadle pre-dates 1991; (b) each of the commission checks received by defendant Douglas White from the respective manufacturers constitutes an "asset" of Douglas White within the meaning of the UFTA, as they clearly are things that may be the subject of ownership (indeed, checks are "negotiable instruments" under Article III of the Uniform Commercial Code – see, Conn. Gen. Stat. Sec. 42a-3-104 (a) – (f)); and (c) the endorsement and delivery of each of the commission checks by Douglas White over to defendant Rosalie White a/k/a Lee White constitutes a "transfer" of an asset within the meaning of the UFTA that was "made" at the time of the endorsement and delivery  (indeed, such activity constitutes a "negotiation" and "transfer" of an "instrument" which vests in the transferee all rights of the transferor to enforce the instrument – see, Conn. Gen. Stat. Sec. 42a-3-

201 and Conn. Gen. Stat. Sec. 42a-3-203).  So too, as Cadle's claim arose before 1991, and all

transfers that are the subject matter of this action come after January 1, 1991, the timing is such

that all of the subject transfers will be fraudulent under the law if they were made with the intent

to hinder, delay or defraud creditors.

### 3. __Intent to Hinder, Delay or Defraud Has Been Clearly Shown.__

The UFTA sets forth the above-referenced "badges of fraud", Conn. Gen. Stat. Sec. 52-

552e (b) (see page 23, *supra*), as a guideline for ascertaining fraudulent intent on the part of the

transferor.  An examination of the badges of fraud, together with other factors, gives rise to a

strong inference of intentionally fraudulent conduct in this case.  The transfers were to the closest

insider on earth – one's spouse.  While the debtor did not retain possession or control of the

property, because of his intimate relationship with his spouse, and their long-standing common

life together, he knew that she would use the proceeds of the commission checks transferred to

her to pay the expenses of his business, the household expenses, and to otherwise support their

individual and collective lifestyle – indeed, this was a pattern of conduct that prevailed every

month of the year, and from year to year, at least since 1991.

In terms of whether the transfers were disclosed or concealed, one's banking

relationships generally are not open to public scrutiny, and are private records; indeed, bank

privacy laws greatly restrict the ability of financial institutions to make such information

available anyone other than the bank customer. Conn. Gen. Stat. Secs. 36a-40 through 36a-43, inclusive. The relative magnitude of the transfers, and their pervasiveness, speak volumes – for the transfers, collectively, were of substantially all of the transferor's assets – leaving him with only his interest in household furnishings and the car that he used for work in his name.

The transferor also received nothing in exchange for the transfers – he was never indebted to his wife and his wife never transferred any property to him in exchange for the transfers (more on this issue, *infra*). The transferor-debtor was insolvent throughout this period of time; indeed, he had suffered a complete business failure, had no meaningful assets at all, and had to return to representing manufacturers on contingency fee equipment sales as his sole means of livelihood.

The foregoing "badges of fraud" point clearly towards an intent to hinder, delay or defraud creditors. But, there is more still – an examination of how the defendants have conducted their financial affairs, including some pointed irregularities, make even more firm the conviction in one's mind that the requisite scienter was present in the mind of Doug White. Before the defendants moved to Connecticut from Massachusetts, they always held title to their marital residence jointly, and they had built up substantial equity in their home over the years. But Doug White became an entrepreneur, and in connection therewith became personally liable for business debts. So, when Doug and Lee White moved to Connecticut, the home that they

purchased, and into which all of the equity from their jointly owned Massachusetts home was put, was placed in the name of Lee White alone. Doug White continued to support the mortgage on the home to which he had no title of record. Yet, when times got tough in the business, he readily tapped some of the equity in "his wife's" home, twice, to obtain needed working capital for his company. Such treatment by the debtor of an asset in the name of his spouse, accessing the equity in it to fund his business purposes, is evidence under precedent that he had control over, an equitable ownership interest in, such property, despite the absence of title.

In 1993, a few years after the business failed, and the Whites were struggling financially to such an extent that Lee White feared losing the house, it was sold to an insider trust for a price that was approximately 40% less than the price at which Lee White, as "agent" for this trust, immediately turned around and marketed the property for resale. The sale of the house to the trust enabled the Whites to eliminate mortgage indebtedness and put significant monies in Lee White's bank account.

In 1997, when Doug White decided that he wanted a boat, he found a 35 foot used sailboat that he fancied, negotiated the purchase and had title put in his mother-in-law's name. The several hundred thousand dollar deficiency judgment that comprises plaintiff's claim was entered against him in court within months of the boat purchase.

For the five years beginning in 1997, through and including 2001, the defendants did not file a federal income tax return. Doug White exercised his Fifth Amendment rights against self-incrimination when asked if he owed taxes to the federal government for those years.

When the couple moved to the Flat Rock Road property in 1998, title again was taken in the name of the Anne Fieldman trust. The defendants live there as "custodians" for the trust, the trustee of which is Doug White's sister, who is unrelated to the settlor of the trust. For years the defendants insured the Flat Rock Road property in their own names, as the owners thereof, to the value and amount of approximately $300,000.00, and they received and had full use of the rents from the apartment annexed to the main home – Doug White himself even having rent checks made payable to his order. Doug White was not truthful about his claimed lack of knowledge as to the identity of the trustee of the Anne Fieldman Trust, and did not acknowledge his awareness of her identity until confronted with the fact that the trustee was his very own sister. Doug White also had a number of commission checks that were due to him made payable initially to the order of Lee White – his explanation that it was the manufacturer's doing, without any encouragement by him, was most implausible.

Doug White claims that since the late 1970's or early 1980's his wife has maintained a checking account in her own name into which his commission checks were deposited; however, back in 2001 he testified that he did not know whether Lee White had an account in her name

alone at any time before 1993, when the Canterbury house was sold.  Of course, back in 2001 he

was answering a plethora of judgment debtor questions without any real focus on this issue (see

Exhibit 2), unlike the trial on the merits four years later, when the starting point of this pattern of

practice became a considerable point of inquiry.  Likewise, Lee White herself does not know

whether her account before 1991 was a joint account or a sole account.  For someone such as

Doug White, who professes to not pay much attention to bills and account statements, and to

basically leave all of that stuff up to his wife, it is disingenuous to claim a solid knowledge at

trial about matters such as the status of title to a bank account at a point in time long before he

got into financial trouble.  Memories generally do not get better with time.  Respectfully, one

who exercises the Fifth Amendment privilege against self-incrimination for fear of prosecution

on income tax evasion, and who has engaged in a number of questionable transactions that just

do not jibe with upright conduct, is not the most credible of witnesses.  It is hornbook law that

"[a]t trial without a jury it is for the trial judge to determine the credibility of the oral testimony

given by the witnesses and the weight to be accorded to it.  The court need not accept even

uncontradicted and unimpeached testimony…"  Wright & Miller, Federal Practice and

Procedure, Civil 2d, Sec. 2586; accord, United States v. Thomas, 351 F.2d 538 (1965).

4.    **Supporting Case Law on Intent**.

In addition to the badges of fraud, case law also supports the conclusion that there was

the requisite intent to hinder, delay or defraud creditors here.  See, e.g., In re: Kaiser, 32 B.R.

701 (Bankr. S.D.N.Y. 1983), affd, 722 F.2d 1574 (2d Cir. 1983) (court denied the debtor a

discharge, due to his fraudulent concealment of an equitable interest in transferred property, and

imposed a constructive trust on such property).[2]

> [E]vidence of [debtor-transferor's] fraudulent intent emerged from his practice of
> asserting and retaining rights of ownership in property purportedly transferred,
> and employing the property for his personal use and benefit.  The trial record
> contains several examples of attempts by the debtor to place his property where
> he can still enjoy it and at the same time require his creditors to remain
> unsatisfied.

In re: Kaiser, 32 B.R. at 705; see also, In re: Kontrick, 295 F. 3d 724 (7th Cir. 2002), wherein the

Seventh Circuit upheld the entry of summary judgment in favor of a creditor, holding that a

debtor who took his name off of a bank account, which account thereafter was titled only in his

wife's name, and thereafter continued to deposit his regular paycheck into the wife's account

(with which monies the family bills were paid), intentionally perpetrated a scheme of transferring

his assets to his spouse with an intent to hinder, delay and defraud his creditors.  Id. at 735-38.

_____

[2] In re: Kaiser was decided under New York's fraudulent conveyance statute (but nonetheless is demonstrative of the culpability of this type of conduct.

The debtor was consequently denied his discharge under 11 U.S.C. Sec. 727. <u>Id.</u> at 735-38.[3] As

the reviewing court in <u>In re: Kontrick</u> opined:

> The bankruptcy court was entitled to conclude that those deposits
> were "transfers" of Dr. Kontrick's property, with the "intent to
> hinder, delay or defraud a creditor" within one year of filing for
> bankruptcy. 11 U.S.C. Sec. 727 (a)(2)(A). By depositing his
> paycheck into an account over which he had no control, Dr.
> Kontrick put those assets beyond the reach of his creditors, just as
> he had done with the property that he transferred to his wife and
> daughter before 1993.

Id. at 737.

### 5. <u>The Statutory Remedies Available As Against Each Defendant.</u>

It is clear that the First Count stands on solid ground as to the culpability of the alleged

conduct in the eyes of the law – that there was a sustained pattern of transfers by the debtor of his

assets, to his wife, defendant Lee White, with an intent to hinder, delay or defraud creditors.

Accordingly, the remedies provisions of the UFTA provide redress to the plaintiff in the form of

"avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; …

(3) subject to applicable principles of equity and in accordance with applicable rules of civil

procedure (A) an injunction against further disposition by the debtor or a transferee, or both, of

the asset transferred or of other property … or (C) any other relief the circumstances may

---

[3] The case identified in <u>Kontrick,</u> and contended by the appellant therein to be persuasive authority in his favor, <u>In re: Ratner</u>, 132 B.R. 728 (Bankr. N.D. Ill. 1991), is inapposite to our fact pattern because in that case the debtor's bank account was involuntarily closed, he was unable to open a new account, and thus deposited his paycheck into his wife's account.

require." Conn. Gen. Stat. Sec. 52-552h. The next succeeding statutory section grants plaintiff

the right of action and remedy against the initial transferee, here defendant Lee White:

> (b) [T]o the extent a transfer is voidable in an action by a creditor
> under subdivision (1) of subsection (a) of 52-552h, the creditor
> may recover judgment for the value of the asset transferred . . . or
> the amount necessary to satisfy the creditor's claim, whichever is
> less. The judgment may be entered against: (1) The first transferee
> of the asset or the person for whose benefit the transfer was made. .
> . .

> (c) If the judgment under subsection (b) of this section is based
> upon the value of the asset transferred, the judgment must be for an
> amount equal to the value of the asset at the time of the transfer,
> subject to adjustment as the equities may pertain.

Conn. Gen. Stat. Sec. 52-552i. This remedy against the transferee, however, is subject to a

statutory affirmative defense if the transferee can prove that she took the assets in good faith and

for a reasonably equivalent value. Id.

### 6. Defendant Lee White Cannot Establish Her Affirmative Defense of Good Faith and Reasonably Equivalent Value.

Defendant Lee White cannot prove either of the two essential elements of her affirmative

defense – that she took the transfers in good faith and for reasonably equivalent value.

> Value is given for a transfer or an obligation if, in exchange for the
> transfer or obligation, property is transferred or an antecedent debt
> is secured or satisfied, but value does not include an unperformed
> promise made otherwise than in the ordinary course of the

promisor's business to furnish support to the debtor or another
person.

Conn. Gen. Stat. Sec. 52-552d.  No value at all was given in exchange for the transfer of the

commission checks, such that the issue of "reasonable equivalency" need not even be reached.

Defendant Lee White never transferred any property to Doug White in exchange for his

commission checks; nor was Doug White ever indebted to Lee White.  Instead, Lee White made

discretionary use of the proceeds of the commission checks to pay the expenses of the operation

of Doug White's business, to pay the couple's household expenses and to pay the defendants'

respective and collective expenses of their common life together (i.e., his expenses, her expenses

and their expenses).  No such "uses" of the proceeds of the transferred assets constitutes the

giving of value to the debtor-transferor – it is not a transfer of property to him and he is not

satisfying any antecedent debt owed to the transferee.

A debtor's use of assets diverted to an insider does not qualify as the receipt of valuable

consideration for the transfer/diversion; rather, for there to be effective consideration, "the

relevant inquiry is whether the consideration received was in a form available for execution by

creditors, i.e., an assessment of the extent to which such creditors were deprived of the value of

the diverted property."  The Cadle Company v. Frank F. Ogalin, 303 B.R. 552, 559 (Bankr. D.

Conn. 2004); accord, Cruickshank-Wallace v. County Bank and Trust Co., 2005 Md. App.

LEXIS 272 (copy attached) ("Fair consideration must flow from the initial transferee ... and not

merely from the ultimate recipient of the funds [the transferor's creditor."]).  Furthermore, the

retention of possession or control of property transferred is one of the classic badges of fraud.

Conn. Gen. Stat. Sec. 52-552e.  Use of transferred property for the common benefit of the

transferor and the insider transferee is probative of such possession and control.  And that is just

the point: the judgment debtor is shielding assets to support and maintain the defendant couple's

lifestyle.  The scheme here is evident: the judgment debtor clearly structured his financial affairs

in such a way as to hold his creditors at bay (through legal title machinations) and yet provide a

comfortable lifestyle for himself and his wife.

> In the intervening 20 years, … there has been no case in which a
> spouse has successfully argued that a transfer of money from the
> other spouse, when the other spouse was insolvent, was fair
> consideration because the money was used to purchase household
> basics for the family.
>
> *   *   *
>
> If one steals in order to provide for one's family, it is no less a
> theft.  In the same way, if one transfers assets while insolvent in
> order to provide for one's family, it is no less a fraudulent transfer.

Cruickshank-Wallace v. County Bank and Trust Co., 2005 Md. App. LEXIS 272 (copy

attached).

Just like the absence of "reasonably equivalent value", defendant Lee White cannot

establish the second necessary element to her affirmative defense: good faith.  Since the adoption

of the UFTA, Connecticut state and federal courts have looked to the Bankruptcy Code for

guidance as to how the good faith defense must be proven. See <u>Yolen and Perzin, LLC v.</u> <u>Wright</u>, 2003 Conn. Super. LEXIS 1754 at *7 (May 19, 2003) (copy attached); <u>Quantum Sail</u> <u>Design Group</u>, 2004 U.S. Dist. LEXIS 9679 at *6 (copy attached). These courts have determined that a transferee must show the transaction occurred at arms-length and that he or she had no knowledge of the fact that the transaction would hinder, delay or defraud others. See <u>Yolen and Perzin</u>, 2003 Conn. Super. LEXIS 1754 at * 7; <u>Quantum Sail Design Group</u>, 2004 U.S. Dist. LEXIS 9679 at *6.

The arms-length component of good faith, introduced to the UFTA in Connecticut through the cases cited above, presents an obstacle to insider and familial transferees that did not exist under the common law "actual knowledge" standard. The very definition of arms-length seemingly precludes familial transferees from proving good faith. See <u>Black's Law Dictionary</u> 103 (7th ed. 1999) ("Of or relating to dealings between two parties *who are not related* or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship.") (emphasis added). In <u>Qunatum Sail Design Group</u>, however, where a familial transferee sought to establish the good faith defense after a default judgment entered against the transferor, the court implicitly refused to establish a per se rule that such transfers are not at arms-length when it held that the transferee had the right to litigate the defense and noted, "The fact that the transferee and transferor in this case are husband and wife has not been lost on

the court.  However, this fact alone does not provide grounds to deprive the transferee of the

right to present a defense." Quantum Sail Design Group, 2004 U.S. Dist. LEXIS 9679 at *9 n.1.

Beyond the new arms-length requirement, the reliance of these courts on the Bankruptcy

Code's good faith defense provisions[4] suggests that the codification of the UFTA has superseded

the common law rule that the transferee's knowledge must be proven subjectively rather than

objectively or constructively.  Cf. Knower v. The Cadden Clothing Co., 57 Conn. 202 (1889)

(setting forth the common law view).  Under the Bankruptcy Code, the emerging rule is that a

transferee is charged with constructive knowledge of the fraudulent transfer if he or she was on

inquiry notice of the transferor's approaching insolvency.  See Alan N. Resnick, Henry J.

Sommer, and Lawrence P. King, 5 Collier on Bankruptcy ¶¶ 548.07(2)(a) and 550.03(2)  (15th

ed. 2005).  Although the Second Circuit and the federal courts in Connecticut have not

considered the question, the federal courts in New York have embraced the constructive notice

approach to good faith, as have the Eighth and Tenth Circuit Courts of Appeals.  See In re Enron

Corp., 333 B.R. 205, 2005 Bankr. LEXIS 2218 at *70-71(Bankr. S.D.N.Y. 2005); In re Bean,

---

[4] "Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA." Levit v. Spatz (In re: Spatz), 222 B.R. 157,164 (N.D. Ill. 1998); see also In re: Image Worldwide, Ltd., 139 F.3d 574, 577 (7th Cir. 1998) (because the Illinois UFTA is a uniform act which derived phrases from § 548 the court may look to cases under § 548 and other cases interpreting other states' versions of the UFTA for assistance.)

251 B.R. 196, 201-02 (E.D.N.Y. 2000); Brown v. Third Nat'l Bank, 67 F.2d 1348, 1355 (8th Cir. 1995); In re M & L Business Machine Co., Inc., 84 F.3d 1330, 1338 (10th Cir. 1996). Other jurisdictions have also interpreted the UFTA as incorporating the concept of constructive knowledge into the good faith defense. See, e.g., In re World Vision Entm't, Inc., 275 B.R. 641, 659-60 (Bankr. M.D. Fla. 2002); In re Jones, 184 B.R. 377, 388 (Bankr. D. N.M. 1995); In re Agricultural Research and Technology Group, Inc., 916 F.2d 528, 535-36 (9th Cir. 1990). Under this approach, and consistent with the bankruptcy rule cited above, good faith requires "minimal due diligence" on the part of a transferee who has reason to question the transferor's financial stability. In re World Vision Entm't, 275 B.R. at 660 (Bankr. M.D. Fla. 2002).

In light of these authorities and the Connecticut state and federal courts' explicit reliance on bankruptcy authority in construing the UFTA's good faith defense, a transferee is charged with constructive knowledge of the fraud when he or she is on inquiry notice of the transferor's approaching insolvency. Based on the evidentiary record recited above, defendant Lee White clearly was on such inquiry notice, and more likely than not, had actual knowledge of Doug White's dire financial condition. Therefore, she cannot establish her own good faith in defense to the First Count.

422251v8                                          39

Because she neither gave reasonably equivalent value, nor acted in good faith, defendant Lee White has no good affirmative defense to plaintiff's First Count for transferee liability regarding the transferor's intentionally fraudulent transfers.

### B. **The Second Count: Constructively Fraudulent Transfer of Assets – Type One.**

The Second Count, brought under Connecticut General Statutes §52-552e(a)(2), requires the plaintiff to establish, as to each challenged transaction for which recovery is sought, that the transaction constituted a "transfer" of an "asset" by the defendant-transferor, that was made without defendant Douglas White (the transferor) receiving reasonably equivalent value in exchange therefor, and at a time when (i) he was engaged or about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction or, alternatively, (ii) he intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. Plaintiff seeks, by way of relief, *inter alia*, money damages against the transferee, the avoidance of transfers and an injunction against further transfers.

For each and every reason that the plaintiff proved its entitlement to relief on the First Count, the plaintiff is entitled to judgment on the Second Count. The only differences are that, (1) unlike the First Count, with the Second Count intent to defraud is irrelevant, (2) with the Second Count, the burden of proof is on the plaintiff to demonstrate that Doug White did not

receive reasonably equivalent value in exchange for the transfers (as opposed to the defendant-transferee having the opportunity to establish the giving of reasonably equivalent value as one element of a two element affirmative defense), and (3) with the Second Count, plaintiff also must prove that, at the time of the transfers, Doug White (i) was engaged or about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction or, alternatively,  (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

For each reason why Lee White cannot show that she gave reasonably equivalent value, the plaintiff has shown, by the same evidence and applicable law, that Doug White did not receive reasonably equivalent value in exchange for the transfers.  Furthermore, the Stipulation and evidentiary record prove the last element of plaintiff's case on the Second Count, for the preponderance of Doug White's business expenses were paid by Lee White with the proceeds of the commission checks transferred to her, and Doug White himself retained only modest commission checks and wrote only very modest business expense checks.  That, coupled with his stipulated insolvency for the years in question (as to which insolvency competent evidence also was adduced at trial in addition to the Stipulation), show that Doug White had insufficient assets in relation to his business and intended to incur, or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.  In essence, Doug White made

himself completely dependent on the monies that he transferred to defendant Lee White in order to meet his business expenses and remain in business. By either proof standard, plaintiff has proven constructive fraud – type one.

### C.  The Third Count: Constructively Fraudulent Transfer of Assets – Type Two.

The Third Count, brought under Connecticut General Statutes §52-552f, requires the plaintiff to establish, as to each challenged transaction for which recovery is sought, that the transaction constituted a "transfer" of an "asset" by the defendant-transferor, that was made without defendant Douglas White (the transferor) receiving reasonably equivalent value in exchange therefor, and that defendant Douglas White was insolvent at the time of such transfer or became insolvent as a consequence of such transfer. Plaintiff seeks, by way of relief, *inter alia*, money damages against the transferee, the avoidance of transfers and an injunction against further transfers. For each and every reason why plaintiff has established its right of recovery on the Second Count, it has similarly established its right of recovery on the Third Count, except for the Third Count plaintiff need not offer any proof concerning the insufficiency of assets for payment of debts and can rest on the Stipulation (last paragraph of Stipulation) and proof of insolvency.

## VI.    **Proposed Findings of Fact and Conclusions of Law.**

This civil action, commenced by complaint dated January 4, 2002, was brought in three counts under the Uniform Fraudulent Transfer Act as enacted in the State of Connecticut, Connecticut General Statutes Section 52-552a through 52-552l, inclusive.  The first count is based on allegedly intentionally fraudulent conduct, and was brought under Connecticut General Statutes Section 52-552e (a)(1).  The second count is based on allegedly constructively fraudulent conduct, and was brought under Connecticut General Statutes Section 52-552e (a)(2). The third count is also based on allegedly constructively fraudulent conduct, and was brought under Connecticut General Statutes Section 52-552f.  The court makes the following findings of fact and conclusions of law.

Plaintiff's Proposed Findings of Fact.

1.      Plaintiff, The Cadle Company ("Cadle"), is an Ohio corporation with its principal place of business at 100 North Center Street, Newton Falls, Ohio.

2.      Defendant, Douglas C. White ("Douglas White") is an individual residing at 53 Flat Rock Hill Road, Old Lyme, Connecticut.

3.       Defendant, Rosalie A. White ("Rosalie White") is an individual residing at 53 Flat Rock Hill Road, Old Lyme, Connecticut.

4.    This Court has jurisdiction over this action by virtue of the diversity of citizenship between the parties pursuant to 28 U.S.C. Section 1332.  The amount in controversy exceeds the sum of $75,000.00.

5.    Venue is proper in this district pursuant to 28 U.S.C. Section 1391 because the defendants reside in this district.

6.    Plaintiff is the judgment creditor of defendant Douglas White by virtue of, and pursuant to the terms and provisions of, a certain final judgment entered in a civil action formerly pending in the Superior Court for the Judicial District of Windham at Putnam, which civil action became known as The Cadle Company v. Glen Falls Realty Partnership, et al and bearing civil action number CV-96-0053687-S, which judgment was entered on or about April 21, 1997 in the amount of $317,854.10, which includes costs, interest, taxes and additional fees (hereinafter collectively referred to as the "Judgment").  The indebtedness with respect to which the Judgment relates pre-dates 1991.

7.    To this date, the Judgment remains unsatisfied, and, as of the present time, the Judgment, plus post-judgment interest from and after the entry of the Judgment up to and including the present time, remains due and owing to The Cadle Company from Douglas C. White.  The accrued interest on the Judgment, as of August 9, 2004, is the sum of $244,922.52, to which additional interest continues to accrue at the per diem rate of $88.29.  Thus, the amount

of the outstanding judgment as of August 9, 2004 is the sum of $562,776.62, to which a per diem rate of $88.29 is applied for the 533 days elapsed since the date of the Stipulation, yielding a total judgment amount as of February 3, 2006 at $609,835.19.

8. Defendant Douglas White and defendant Rosalie White are husband and wife, respectively.

9. Defendants Douglas White and Rosalie White are not estranged, one from the other, and they currently live together as husband and wife, and have so lived together from and after the entry of the Judgment through and including the present time.

10. The defendant Douglas White is a manufacturer's representative, a sole proprietor who earns money solely on a commission basis from the various companies that he represents. These commissions are paid to Douglas White periodically by means of a check issued by the respective manufacturer and payable to the order of Douglas White in the amount of the earned commission. Upon receipt of each of his commission checks, Douglas White endorses and delivers the commission check over to his wife, defendant Rosalie White (a/k/a Lee White), with the exception of a small number of commission checks in modest dollar amounts that he retains and deposits into his own checking account.

11. Defendant Rosalie White deposits the endorsed commission checks into her checking account, an account maintained solely in her name and over which defendant Douglas

White has no signatory authority (which account, over the years, has been maintained first with The Washington Trust Company and, thereafter, with Liberty Bank).

12. The foregoing check negotiation and deposit pattern has continued, on an uninterrupted basis (with the exception of a small amount of modest commission checks that were deposited by Douglas White into his own checking account), since at least 1991, and has continued up through and including the present time.

13. Nothing was given by defendant Rosalie White to Douglas White, or otherwise received by Douglas White, in exchange for the foregoing check negotiations. No property was transferred to Douglas White in exchange for the foregoing check negotiations and no antecedent debt of Douglas White was secured or satisfied in exchange for the foregoing check negotiations (Douglas White was not even indebted to Rosalie White for there to have been any such security or satisfaction of antecedent debt).

14. Defendant Rosalie White uses the money in said account, in part, to pay the defendants' respective and collective living expenses of their common life together, which payments are made by checks drawn by her on said account. In addition thereto, most of the defendant-transferor's business expenses for his sole proprietorship are paid by the defendant-transferee, Rosalie White (a/k/a Lee White), by means of checks drawn by her on her aforesaid personal bank account, with defendant Douglas White writing personal checks on his checking

account for only a modest amount of his overall business expenses.  Thus, the proceeds of the commission checks are, with a few minor exceptions, used by the transferee for those two purposes.

15.  The amount of the commission checks so endorsed and delivered by defendant Douglas White to defendant Rosalie White occurred periodically throughout each year in question, usually at least one check per month and frequently by multiple commission checks per month.  The account records of the bank accounts of defendant Rosalie White (a/k/a Lee White) with The Washington Trust Company and Liberty Bank, together with her testimony (and/or the stipulated facts), and the photocopies of the commission checks deposited into her account and thus presented for collection by defendant Rosalie White (which copies were produced by said banks in many cases), collectively detail the frequency and amount of the commission checks endorsed and delivered to Rosalie White by Douglas White, and itemize the same.

16.  The commission checks so received, endorsed and delivered by Douglas White to Rosalie White for the years 1991 through 1995 were at least $40,000.00 per year.  The commission checks so received, endorsed and delivered by Douglas White to Rosalie White for the years 1996 and 1997 are $45,508.88 and $94,611.03, respectively.  These are the seven years outside of the four years immediately preceding the commencement of the civil action for which

Plaintiff also seeks recovery in the First Count, the years 1991 through 1997, inclusive (which First Count also seeks recovery for the time period encompassed by the Second and Third Counts).

17.  Over the four years immediately preceding the commencement of this civil action, collectively there has been $251,922.666 in commission checks received, endorsed and delivered by Douglas White over to Rosalie White and deposited by her into her checking account.  From and after the commencement of this civil action, there has been an additional $39,213.79 in commission checks so received, endorsed and delivered by Douglas White over to Rosalie White and deposited by her into her checking account.

18.  In the mid-1980s, defendant Douglas White formed a corporation with several other individuals, all of whom, including Douglas White, were managing shareholders of the business. The business grew for a time, and the volume of business outgrew its facilities.  The shareholders then decided to form a partnership to purchase a new location to house the business facilities (Glen Falls Realty Partnership), which real property purchase was financed with a purchase money loan secured by a mortgage on the business premises.  The defendant Douglas White was an obligor on the corporate and real estate debt.

19.  The nature of the business was the packaging of products for and on behalf of manufacturers, which products would be packaged at the facility.  The preponderance of the

business was manufacturers' overflow, i.e., the packaging of products that the manufacturers could not handle themselves internally due to the volume of business. When the economy retracted in the late 1980s, manufacturers' sales volumes decreased to the extent that the outsourcing of product packaging substantially diminished (at least to the defendant's company), defendant's company suffered severe financial reversals as a consequence thereof, and closed its doors for good in the early 1990s. The real property that housed the business was foreclosed and a deficiency judgment was entered in connection therewith, which is the judgment on which the plaintiff's creditor status rests.

20.     Prior to moving to Connecticut, the defendants owned successive residences in Massachusetts, which residences were always titled in their names jointly. Approximately one year after starting the company, the couple moved to Connecticut, to the real property commonly known as 255 Cemetery Road, Canterbury Connecticut. This property, into which the equity from the sale of the Massachusetts' home was put, was conveyed to defendant Rosalie White alone. Defendant Douglas White's salary was used in substantial measure to pay the mortgage debt.

21. Defendant Doug White accessed the equity in the Canterbury home on two occasions to obtain needed working capital loans for his business, which loans were guarantied by Rosalie White and secured by mortgages on the Canterbury home, all in an ultimately

unsuccessful effort to salvage the business.  In 1993, the Cemetery Road property was sold to a trust, the so-called Anne Fieldman Trust (of which defendant Rosalie White is a beneficiary), for the sum of $213,500.00, and the defendants continued to reside in said residence until 1998.

22.  Less than three weeks after the closing, defendant Rosalie White, purportedly on behalf of the trust, entered into a listing arrangement with a broker, listing the property for sale at the asking price of $297,000.00, nearly $84,000.00 greater than the sum paid for the property by the trust.  A contract to sell that property was entered in early 1994 for the sum of $275,000.00, but a contingency clause caused that contract to fall through.

23.  In 1998 the house was sold and the proceeds thereof were used to purchase the couple's current residence, 53 Flat Rock Road, Old Lyme, Connecticut.  Title was taken in the name of the trust, the trustee of which is defendant Douglas White's sister (no relation to the settlor of the trust and the sister-in-law of trust beneficiary defendant Rosalie White).  The defendants live there rent free, paying only the real estate taxes on the property, and that with the income received by them from renting a modest apartment that is attached to the home.  The defendants insure the dwelling at 53 Flat Rock Road for at least $300,000.00 and for years the policy was issued in their names jointly as the owners of the real property.

24.  In February of 1997, just prior to the entry of the $317,000.00 deficiency judgment against defendant Douglas White, a contract was entered into for the purchase of a used 35 foot

sailboat in the approximate amount of $50,000.00.  The $5,200.00 deposit was paid for by the funds in defendant Rosalie White's checking account (into which Douglas White's canceled checks were deposited).  Defendant Douglas White selected the boat, negotiated the contract, and commissioned and paid for the boat "survey," signing the check for the survey despite not technically having signatory authority over the Rosalie White checking account.  Title to the boat was taken in the name of Rosalie White's then 91 year old mother.  The sailboat is docked at a marina near the defendants' home, and they are the ones who presently and, in the past, make use of it.  The registration fee with the state is paid by Doug White.

25. Defendant Douglas White was insolvent throughout the period of time that he has transferred his income to his wife, from at least 1991 to the present.  Throughout that period of time the defendant Douglas White has held no real property in his name, no financial investments in his name, and only very modest items of personal property.  The only other items of personal property that he may have are the contingent fee commissions (i.e., the contract to receive a commission if the customer for the item fully pays the manufacturer therefor, at which point in time the fee commission is paid to defendant Douglas White and then paid over by him to defendant Rosalie White).  The amount of such contingent claims is negligible when compared to his liabilities.  Throughout this period of time, Douglas White's liabilities greatly exceeded his assets.