### UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

**THE CADLE COMPANY,**
          **-Plaintiff**


     **-vs-**                                    **3:02-CV-00030 (TPS)**


**DOUGLAS WHITE AND**
**ROSALIE A. WHITE,**
          **-Defendants.**


### BENCH TRIAL RULING

This diversity case is brought pursuant to the Uniform Fraudulent Transfer Act ("UFTA") as codified in Connecticut. Conn. Gen. Stat. §§ 52-552a to 52-552l. The plaintiff Cadle Company ("Cadle"), a judgment creditor, claims that the judgment debtor, defendant Douglas White, fraudulently transferred most of his personal commission checks to the exclusive possession of his wife, defendant Rosalie A. White ("Lee White"). Cadle seeks to void these transfers under one count of intentional fraud and two counts of constructive fraud. Conn. Gen. Stat. §§ 52-552e(a)(1), 52-552e(a), 52-552f(a). On the first count, plaintiff challenges transfers between 1991 and 2002, while on counts two and three plaintiff only seeks invalidation of transfers between January 24, 1998 and the end of 2002.[1] Plaintiff also seeks to impute

---

[1]

     The court can find no explanation as to why these dates have been chosen. However, because the plaintiff has chosen them and

liability for the entire debt on Lee White via Conn. Gen. Stat. § 52-552i(b).

Prior to trial the parties submitted a Joint Pre-Trial Memorandum which included extensive stipulations of fact. The stipulations reduced the necessary factual determinations to such a degree that only two critical mixed findings of law and fact need be made by the court. First, under the intentional fraud count, whether Douglas White actually intended to defraud creditors; and, second, under all counts, whether Lee White received "reasonably equivalent value" for the transfers. On December 1, 2005 the undersigned presided over a short bench trial in this case. Only the testimony of Douglas White was taken. After trial, the court ordered simultaneous submissions of proposed findings of fact and conclusions of law which have been received and reviewed.

For the reasons stated herein the court finds in favor of the plaintiff on all counts. Judgment is entered, as of March 21, 2006, against both defendants in the amount of $614,691.14 with *per diem* interest in the amount of $88.29 to be applied until the judgment is satisfied. Further, an injunction is hereby entered prohibiting defendants from future like transfers.

## I.    **Findings of Fact**

The court incorporates the parties' stipulated facts as

---

the defendant has not objected, the court will proceed under these chronological restraints.

findings of the court.  Additional findings of fact are made based on the credible testimony and the evidence admitted at trial.

## A.    Stipulated Facts[2]

1. Plaintiff, The Cadle Company...is an Ohio corporation with its principal place of business at 100 North Center Street, Newton Falls, Ohio.

2. Defendant, Douglas C. White...is an individual residing at 53 Flat Rock Hill Road, Old Lyme, Connecticut.

3. Defendant Rosalie A. White...is an individual residing at 53 Flat Rock Hill Road, Old Lyme, Connecticut.

...

6. Plaintiff is the judgment creditor of defendant Douglas White by virtue of, and pursuant to the terms and provisions of, a certain final judgment entered in a civil action formerly pending in the Superior Court for the Judicial District of Windham at Putnam, which civil action became known as The Cadle Company v. Glen Falls Realty Partnership, et al and bearing civil action number CV-96-0053687-S, which judgment was entered on or about April 21, 1997 in the amount of $317,854.10, which includes costs, interest, taxes and additional fees....The indebtedness with respect to the Judgment relates pre-dates 1991.

7. To this date, the Judgment remains unsatisfied, and, as of the present time, the Judgment, plus post-judgment interest from and after the entry of the Judgment up to and including the present time, remains due and owing to The Cadle Company from Douglas C. White.  The accrued interest on the Judgment, as of August 9, 2004, is the sum of $244,922.52, to which additional interest continues to accrue at the per diem rate of $88.29.  Thus the amount of the outstanding judgment as of August 9, 2004 is the sum of $562,776.62, to which a per diem rate is applied from and after August 9, 2004.

---

[2]

The court reproduces the stipulated facts from pages 5-10 of the parties' Joint Trial Memorandum filed August 13, 2004 (Dkt. #41).  Where indicated, certain phrases and paragraphs irrelevant to the ruling are omitted.

8. Defendant Douglas White and defendant Rosalie White are husband and wife respectively.

9. Defendants Douglas White and Rosalie White are not estranged, one from the other, and they currently live together as husband and wife, and have so lived together before and after the entry of the Judgment through and including the present time.

10. The defendant Douglas White is a manufacturer's representative, a sole proprietor who earns money solely on a commission basis from the various companies that he represents. These commissions are paid to Douglas White periodically by means of a check payable to the order of Douglas White in the amount of the earned commission. Upon receipt of most of his commission checks, Douglas White endorses and delivers the commission check over to his wife, defendant Rosalie White (a/k/a Lee White). He retains and deposits the other checks into his own checking account (which is a joint account).

11. Defendant Rosalie White deposits the endorsed commission checks into her checking account, an account maintained solely in her name and over which defendant Douglas White has no signatory authority (which account, over the years, has been maintained first with the Washington Trust Company and, thereafter, with Liberty Bank).

12. The foregoing check negotiation and deposit pattern has continued, on an uninterrupted basis for a time prior to 1991, and has continued up through and including the present time.

13. Defendant Rosalie White uses the money in said account, in part, to pay the defendants' respective and collective everyday living expenses of their common life together, which payments are made by checks drawn by her on said account. In addition thereto, most of the defendant-transferor's business expenses for his sole proprietorship are paid by the defendant-transferee, Rosalie White...by means of checks drawn by her on her aforesaid personal bank account, with defendant Douglas White writing personal checks on his checking account for only a modest amount of his overall business expenses. Thus, the proceeds of the commission checks are, with a few minor exceptions, used by the transferee for those two purposes.

-4-

14. The amount of the commission checks so endorsed and delivered by defendant Douglas White to defendant Rosalie White occurred throughout each year in question.  The account records of the bank accounts of defendant Rosalie White (a/k/a Lee White) with The Washington Trust Company and Liberty Bank, together with her testimony (and/or the stipulated facts), and the photocopies of the commission checks deposited into her account and thus presented for collection by defendant Rosalie White (which copies were produced by said banks in many cases), collectively detail the frequency and amount of the commission checks endorsed and delivered to Rosalie White by Douglas White, and itemize the same.

15. In the mid-1980s, defendant Douglas White owned a corporation with several other individuals.  The shareholders then decided to form a partnership to purchase a new location to house the business facilities (Glen Falls Reality Partnership), which real property purchase was financed with purchase money loan secured by a mortgage on the business premises.  The defendant Douglas White was an obligor on the corporate and real estate debt.

16. The nature of the business was the packaging for and on behalf of manufacturers, which products would be packaged at the facility.  The Company closed its doors for good by the early 1990s.  The real property that housed the business was foreclosed and a deficiency judgment was entered in connection therewith, which is the judgment on which the plaintiff's creditor status rests.

17. Prior to moving to Connecticut, the defendants owned successive residences in Massachusetts, which residences were always titled in their names jointly.  Approximately one year after starting the company, the couple moved to Connecticut, to the real property commonly known as 255 Cemetery Road, Canterbury Connecticut.  This property, into which the equity from the sale of the Massachusetts' home was put, was conveyed to defendant Rosalie White alone. Defendant Douglas White's salary was used in substantial measure to pay the mortgage debt.

18. In 1998 the house was sold by the Trust and the proceeds thereof were used to purchase the couple's current residence, 53 Flat Rock Road, Old Lyme, Connecticut.  For a period of time Rosalie White's parents resided at that address.  Title was taken in the name of the trust, the trustee of which is defendant Douglas White's sister (no

relation to the settlor of the trust and the sister-in-law
of trust beneficiary defendant Rosalie White).

19. From at least 1997 through and including the present
time, the defendant Douglas White has held no real property
in his name, no financial investments in his name, and only
very modest items of personal property.  The only other
items of personal property that he may have are the
contingent fee commissions (i.e., the contract to receive a
commission if the customer for the item fully pays the
manufacturer therefor, at which point in time the fee
commission is paid to defendant Douglas White and then paid
over by him to defendant Rosalie White).  The amount of
such contingent claims is negligible when compared to his
liabilities.  Throughout this period of time, Douglas
White's liability to Cadle Company and its predecessors
exceeded his assets.

## B.  Additional Findings of Fact

    Compak was the name of the packaging corporation Douglas White
began in the mid 1980's.  (Tr. 11.)  Glen Falls Partnership was a
partnership formed by most of Compak's principals with the
exclusive purpose of purchasing property.  (Tr. 15.)  Shortly
before Compak failed, Douglas White and some or all of Compak's
principals took out loans on their private residences in an attempt
to save the company.  (Tr. 16-17.)  Douglas White continued to work
as a manufacture's representative while Compak was in existence,
however he turned all of his commissions over to Compak and they
became Compak's property.  (Tr. 22.)  After Compak's collapse Mr.
White continued to work as a manufacture's representative and
continues to work as one today.  (Id.)  Mr. White's primary income
is the commission checks he receives from various manufacturers for
sales he has made on their behalf.  From 1991 to the present he

-6-

estimates he earned between $50,000-$70,000 per year in commissions. (Id.)  On at least two occasions, commission checks have been made payable to Lee White directly.  (Tr. 55; Ex. 14.)

In February of 1997 Douglas White entered into a contract, purportedly on behalf of his mother-in-law, Pauline Aronson, to purchase a 35-foot sailboat for $50,000.  (Tr. 40.)  At the time of the purchase Mrs. Aronson was 91 years old.  (Tr. 41.)  Mrs. Aronson lived in Old Lyme for a short time, but resided in upstate New York for most of her life.  (Tr. 33.)  Mr. White testified that the boat was purchased by Aronson with the intention that it would be primarily used by him and his brother-in-law.  (Tr. 45.)  Mr. White's brother-in-law maintains residences in Ohio and Pennsylvania and owns a boat of his own which he uses on Lake Erie. (Tr. 44.)  The sail boat was registered in Connecticut and was docked near the defendants' home in Old Lyme.  (Tr. 43.)  Douglas White paid for an inspection of the boat by signing a check drawn on Lee White's account.  (Ex. 8, Tr. 42.)  Mr. White did not have signatory authority to negotiate a check on Lee White's account. (Tr. 43.)

Shortly after starting Compak, in 1986, Douglas and Lee White moved from Massachusetts to Canterbury, Connecticut.  (Tr. 61.) The house in Massachusetts was owned jointly by the Whites, but the house purchased in Connecticut was placed in Lee White's name only. (Tr. 63.)  In 1993 the Canterbury residence was sold to a trust

called the Anne Fieldman trust for $213,000. The trustee for the Anne Fieldman trust was Douglas White's sister, Roslyn Duncan. (Ex. 3 at 13, 17.) Approximately two weeks later the trust listed the Canterbury residence for sale for $297,000. Several months after the property was listed, on January 21, 1994, the Canterbury home was sold to a third party by the Anne Fieldman trust for $275,000. Lee White, as agent for the trust, signed the sales and purchase agreement as well as the exclusive listing agreement with the real estate agent. (Exs. 54, 55.) The sales contract on the Canterbury house fell through and the Whites continued to live in the house until 1998. (Tr. 31-32.) Periodically the Whites would pay rent on the Canterbury house to the Trust, however they often were unable to make the payments. Although they missed payments the Whites never believed they were in danger of being forced to leave. (Ex. 3.) In 1998 the Whites moved to their current house in Old Lyme, Connecticut. The Old Lyme residence is also owned by the Anne Fieldman trust. The Whites make no payments to the trust. There is no written instrument granting the Whites any interest in the Old Lyme property. The Whites do, however, make use of income generated from renting an apartment on the property. At times the rent payments have been made directly to Douglas White. Until shortly before the trial the house was insured for $298,000, the policy naming Lee and Douglas White as beneficiaries.

Plaintiff's Exhibit 52 was admitted at trial. That exhibit

itemizes commission checks issued between 1996 and 2002 which were endorsed over by Douglas White to the exclusive control of Lee White. Based on this exhibit the court finds that between 1996 and 2002 Douglas White transferred a total of $428,162.84 to Lee White's exclusive possession. (Ex. 52.) Douglas White also testified that he received $50,000 and $70,000 per year in commission checks between 1991 and 1995. (Tr. 22.) Therefore, Mr. White earned between $250,000 and $350,000 in income between 1991 and 1995. The evidence shows that Mr. White transferred most, but not all of his income to his wife. With this in mind, conservatively estimating that Mr. White retained 20% of his income, the court further finds that Douglas White transferred approximately $200,000 to $280,000 to Lee White's exclusive possession between 1991 and 1995. As a result, the court determines the total amount of transfers between 1991 and 2002 to be between $628,162.84 and $708.162.84.[3] Finally, because it is relevant for counts two and three, the court also finds that the amounts transferred between January 24, 1998 and January 24, 2002

---

[3]
The calculation is as follows:

| Years | Amount |
|-------|--------|
| 1991-1995 | $200,000 - $280,000 (estimated based on testimony) |
| 1996-2002 | $428,162.84 (Exhibit 52) |

| 1991-2002 | $628,162.84 - $708.162.84 |

is $288,042.93.[4]

### III.    Conclusions of Law

At the outset it is appropriate to address terms defined in the UFTA which will become relevant on all counts.   The UFTA defines the term "asset" as "property of a debtor."  Conn. Gen. Stat. § 52-552b(2).  "Property" is defined as "anything that may be the subject of ownership."  Conn. Gen. Stat. § 52-552b(10).   In this case the commission checks were Douglas White's property which, in turn, became his assets.

The UFTA defines "debtor" as "a person who is liable on a claim" and "creditor" as "a person who has a claim."  Conn. Gen. Stat. § 52-552b(4),(6).  The term claim means "a right to payment whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  Conn. Gen.

---

[4]

As discussed _infra_ at 1-2, plaintiff seeks only to invalidate the transfers that occurred between January 24, 1998 and Janury 24, 2002 on counts two and three.
The calculation is as follows:

| Year | Amount |
| --- | --- |
| 1998 | $66,507.72 |
| 1999 | $62,585.94 |
| 2000 | $54,511.68 |
| 2001 | $65,223.80 |
| 2002 | $39,213.79 |
| 1998-2002 | $288,042.93 |

Stat. 52-552b(3).  The court finds that Cadle is a "creditor" and Douglas White is a "debtor."  The court further finds that Cadle's "claim" arose in 1989, the moment Douglas White personally secured the mortgage on the Glen Falls Realty property.[5]

Finally, with regard to insolvency, the UFTA states that, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  Conn. Gen. Stat. § 52-552c(a).  Alternatively, the statute goes on the say that, "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent."  Conn. Gen. Stat. § 52-552c(b).  Based on these definitions the court finds that Douglas White was insolvent from 1991 to the present.

### A.    Intentional Fraud Count

Conn. Gen. Stat. §52-552e(a)(1) states,

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor

The language identically traces the UFTA.  <u>See</u> Unif. Fradulent Transfer Act § 4(a)(1), 7A U.L.A. 301.  Liability under this

---

[5]

Although no evidence of this was adduced at trial, the court notes that The Cadle Company is not in the business of issuing mortgages and, thus, is not Douglas White's original creditor. Cadle is a debt purchaser and the successor in interest to the original mortgagee and perhaps even others. As a successor in interest Cadle steps into the shoes of the original mortgagee which is why the court refers to Cadle's claim arising in 1989.

section is determined by a two step factual analysis. First, the fact finder must determine whether debtor's obligation to pay arose before the challenged transfer(s) occurred. Daly v. Fusco (In re All-Type Printing, Inc.), 274 B.R. 316, 323 (Bankr. D. Conn. 2002); Daly v. Richardson (In re Richardson), 3:01CV2126(DJS), 2004 U.S. Dist. LEXIS 19635, at *5 (D. Conn. Sept. 28, 2004). The second step is to determine whether actual intent to defraud existed. Conn. Gen. Stat. §52-552e(a)(1).

The record sufficiently establishes that Mr. White's obligation to pay arose before the challenged transfers. Again, on this first count plaintiff seeks to invalidate transfers occurring between 1991 and 2002. That plaintiff has chosen 1991 insinuates that plaintiff is proceeding under the assumption that Mr. White's obligation to pay arose in 1991 when the original mortgagee foreclosed on the property owned by Glen Falls Realty Partnership. This assumption, if it is in fact held by the plaintiff, would be wrong. Mr. White's obligation to pay actually occurred approximately two years earlier when, as a partner, he personally secured the loan. Therefore, the court concludes that all of the challenged transfers occurred after Douglas White's obligation to pay arose.

The next and final step is to determine whether the debtor transferred assets with an affirmative intent to defraud the creditor. Conn. Gen. Stat. §52-552e(a)(1). To determine whether

fraudulent intent is present the statute directs the fact-finder to consider eleven factors, otherwise known as the "badges of fraud." See Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 711 (2d Cir. 1991); Zapolsky v. Sacks, 191 Conn. 194, 200, 464 A.2d 30, 34 (1983). Because direct evidence of fraud is often lacking the badges of fraud allow the fact finder to infer fraudulent intent from other proven facts. See e.g., Hunt, 927 F.2d at 711. The badges of fraud are:

> (1) The transfer or obligation was to an insider,
> (2) the debtor retained possession or control of the property transferred after the transfer,
> (3) the transfer or obligation was disclosed or concealed,
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit,
> (5) the transfer was of substantially all the debtor's assets,
> (6) the debtor absconded,
> (7) the debtor removed or concealed assets,
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred,
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred,
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Conn. Gen. Stat. §52-552e(b)(formatting altered). The plaintiff must prove intentional fraud by the heightened "clear and convincing evidence" standard. Epperson v. Entm't Express, Inc., 338 F. Supp. 2d 328 (citing Dieter v. Dieter, 54 Conn. App. 481,

488, 737 A.2d 926 (1999); <u>Tessitore v. Tessitore</u>, 31 Conn. App. 40, 42, 623 A.2d 496 (1993)); <u>Davenport v. Quinn</u>, 53 Conn. App. 282, 305, 730 A.2d 1184 (Conn. App. Ct. 1999).

The parties in this case have stipulated to facts that lead the court to conclude that badges one, five and nine have been established. There is no dispute that Douglas White transferred most of his assets to Lee White and that Lee White is an insider. Thus badge one is present here. Likewise, the parties have stipulated that the transfers consisted of essentially all of Mr. White's assets, which establishes badge five. Finally, with respect to badge nine, there is no dispute that each transfer made Mr. White insolvent. Thus, badge nine is also present.

The parties do dispute whether the additional facts clearly establish the presence of any of the other badges of fraud. Based on the stipulations and the additional factual findings the court concludes that badges two and eight are also present.

With respect to badge two, the evidence clearly supports the conclusion that Douglas White retained both actual and constructive control over the funds transferred to his wife. As for actual control, on at least one occasion Mr. White personally negotiated and signed checks drawn on Lee White's individual account. Likewise, the record is replete with examples of his constructive retention. Mr. White's business and personal expenses were all paid primarily by the funds deposited in his wife's account. All

-14-

household bills and mortgage/rent payments were also paid using his commissions. Mr. White exhibited a pattern of incurring charges on credit cards knowing that his wife would use his commission checks to pay the bills when they came due. In sum, Douglas White retained all the benefits of his income without the risk of maintaining legal title.

According to the eighth badge of fraud, the fact that the transferor did not receive reasonably equivalent value is a factor weighing in favor of a finding of fradulent intent. The concept of "reasonably equivalent value" is used throughout the UFTA and becomes critical at several points in this case. The court fully addresses this concept below in its discussion on the transferee's affirmative defense to liability. In short, however, the court concludes that Mr. White did not receive reasonably equivalent value. Under the terms of the UFTA, Mr. White received no value whatsoever because he did not receive anything which a creditor could use to satisfy its claim. Thus, badge eight has also been established by clear and convincing evidence.

That five of the eleven badges of fraud are present raises a strong presumption of intent to defraud. This presumption is significantly bolstered by other suspicious circumstances present in this case. The Whites have arranged their financial lives in an unusual manner. They appear very good at enjoying possessions without retaining legal ownership. For instance, the Whites live

in a house, owned by a Trust, for which they pay no rent, yet collect and use rental income from a smaller house on the property. Adding to the suspiciousness is the fact that the White's purportedly sold their Canterbury residence to the trust for $213,500 and, within two weeks, the house was being listed for $297,000. This sale was arranged by Lee White who also secured the realtor and signed all of the essential documents. Lee White supposedly did all this as an "agent" of the trust because she was not the trustee. Additionally, the Whites maintained an insurance policy on the house naming themselves as sole beneficiaries. All together, the Whites have treated the properties on which they have lived as their own, but have not maintained legal ownership for nearly twenty years. This is not to say that establishing a trust necessarily is indicative of fradulent behavior. On the contrary, trusts are normally used for legitimate purposes. However, here the Whites appear to be in complete control of the trust and actually manipulate it to their financial benefit. Under these circumstances this trust appears simply a ruse designed to protect the White's property from their creditors.

Equally suspicious is the purchase of a 35-foot sailboat, allegedly by Lee White's mother, Pauline Aronson. Mr. White would have the court believe that the then 91-year Aronson, an upstate New York resident, wanted to get into sailing. In the event the court found that story implausible, Mr. White provided an

alternative theory which labeled the purchase a gift to himself and his brother-in-law. However this story is equally implausible because Mr. White's brother-in-law already owned a boat of his own and resided in Pennsylvania and Ohio--far away from the Connecticut shoreline. Meanwhile, conveniently for Mr. White, the boat remained docked in nearby Groton, Connecticut. The boat was docked in Groton by virtue of the fact that Douglas White arranged the location and paid the docking fees. Furthermore, it was Douglas White who found the boat and paid the appraisal fee and the down payment. While Mr. White testified that he was later reimbursed by Mrs. Aronson for the purchasing expenses the court finds his testimony incredible. The 1998 wire transfer which allegedly reimbursed Mr. White occurred approximately a year after the expenses were incurred. Also, the record clearly indicates that Aronson regularly wired Lee and Douglas White money. There is no proof that this $6,000 wire transfer was for any specific purpose.

Finally, it is necessary to address defendants' contention that the practice of depositing checks into the account of Lee White predated his financial problems. Defendants claim that this practice began as a matter convenience rather than as a way to avoid creditors. Because Mr. White's job required a good deal of travel it was easier for Lee White to take charge of their personal finances, including paying his bills. If this story were believable it would be one factor weighing against fraudulent

intent.  However, the story is not credible.  Because this is one of the defendants' major defenses, the court would expect that they would have presented some sort of tangible evidence confirming that these transfers began sometime in the 1970's.  The lack of this evidence leads the court to believe that none exists.  The story's credibility is further degraded by Douglas White's vague and evasive testimony on the topic.  He exhibited a remarkable clarity of memory when his lawyer was asking questions, but suffered from poor recollection when plaintiff's attorney questioned him about when and why the transfers began and when and why the formally joint checking account was transferred to Lee White's exclusive ownership.  The court is left with the impression that Douglas White has concocted this story knowing full well that the bank records can neither prove nor disprove his tale.[6]  Finally, the

---

[6]

    The court wishes to make it clear that it is making an affirmative factual finding that the challenged transfers did not significantly predate Mr. White's financial difficulties.  The court is inferring from the lack of credibility of Mr. White's story that the transfers began either in anticipation of potential liabilities (i.e. around the time Mr. White, as a partner in Glen Falls, signed the mortgage) or about  the time of Compak's failure and the initiation of foreclosure on the Glen Falls property.

    The court further notes that it does not view the credibility of Mr. White's story as dispositive in this case.  The fact that the transfers began in the late 70's or early 80's would be just one factor weighing against fraudulent intent which would be weighed against the presence of the five badges of fraud and the other suspicious circumstances.  It is entirely plausible that the transfers began in the late 70's or early 80's and, yet, were still fraudulent.  Mr. and Mrs. White could have decided upon a financial arrangement wherein Lee White maintained legal title to most of their assets while Douglas White incurred most of the financial

credibility of Mr. White's testimony is further eroded by the fact that he could offer no explanation as to why on at least two occasions his personal commission checks were made out directly to Lee White.

Therefore, in light of the presence of five of the eleven badges of fraud, the other suspicious circumstances and the incredibility of the Douglas White's testimony the court finds that all of the challenged transfers were made with the intent to hinder, delay or defraud Douglas White's creditors. Douglas White has arranged his financial life for the past twenty years in such a way as to prevent his creditors from satisfying their debts while at the same time enjoying a moderately high standard of living. For her part, Lee White has aided her husband in this endeavor. For the purposes of count one, the only thing left to consider is whether Lee White may escape liability using an affirmative defense.

Because the court has found that Douglas White intentionally defrauded his creditors, Lee White, as transferee, may only avoid liability if she took with "good faith" and received "reasonably equivalent value." Conn. Gen. Stat. §52-552i(a). The transferee must prove both elements of the defense by a preponderance of the

---

liabilities. Their actual intent may not have been specifically to avoid the Cadle debt but, rather, their creditors in general.

evidence.[7]

The concept of a good faith transferee is embodied in both the UFTA and the Bankruptcy Act but defined in neither. See Unif. Fraudulent Transfer Act § 8(a); 11 U.S.C. § 5489(c). Case law makes clear, however, that in order to prove good faith, the transferee must show both that the transaction occurred at arms-length and that the transferee had no knowledge that the transaction would hinder, delay or defraud creditors. Quantam Sail Design Group, LLC v. Liberty Enters., 3:03cv281(WWE), 2004 U.S. Dist. LEXIS 9679 at *6 (D. Conn. Mar. 26, 2004); In re World Vision Entm't, Inc., 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002). Plaintiff argues convincingly, and without contradiction from the defendants, that the knowledge prong requires mere constructive rather than

---

[7] Plaintiff spends considerable time in its post trial brief addressing the level of Lee White's burden of proof with regard to her good faith defense. In the end, plaintiff concedes that the preponderance of the evidence is the applicable standard. (P's Post-Trial Mem. at 19-20). The fact that no case law exits setting forth preponderance of the evidence as the standard may be attributable to the fact that no party has ever suggested that a higher standard should apply. Regardless, it is clear that the transferee has "the burden" of proving the defense. Unif. Fraudulent Transfer Act cmt. 1 ("The person who invokes this defense carries the burden of establishing good faith and reasonable equivalence of the consideration exchanged.") (citing Chorost v. Grand Rapids Factory Showrooms, Inc., 77 F. Supp. 276, 280 (D.N.J. 1948), aff'd 172 F.2d 327, 329 (3d Cir. 1949); Quantam Sail Design Group, LLC v. Liberty Enters., 3:03cv281(WWE), 2004 U.S. LEXIS 9679 at *9-10 (D. Conn. Mar. 26, 2004). The court finds that "the burden" implies the default civil standard of preponderance of the evidence. See State v. Davis, 229 Conn. 285, 296 (1994).

actual knowledge.  (P's Post-Trial Mem. at 38-39); <u>See</u> <u>Banner v.</u>
<u>Kassow</u>, No. 96-5040, 1996 U.S. App. LEXIS 30734, at *7 (2d Cir.
Nov. 22, 1996)("A transferee does not act in good faith when he has
sufficient knowledge to place him on *inquiry notice* of the debtor's
possible insolvency.")(quoting <u>Brown v. Third Nat'l Bank (In re</u>
<u>Sherman)</u>, 67 F.3d 1348, 1355 (8th Cir. 1995))(emphasis added); <u>In</u>
<u>re Enron Corp.</u>, 333 B.R. 205, 234 (Bankr. S.D.N.Y. 2005).  The
transferee's knowledge is objectively judged by assessing whether
the transferee knew or should have known of the transferor's
fraudulent intent or financial precariousness.  <u>See</u> <u>In re</u>
<u>Agricultural Research & Tech. Group, Inc.</u>, 916 F.2d 528, 535-36
(9th Cir. 1990) (citing early Supreme Court cases interpreting good
faith defense provisions within previous fraudulent conveyance
statutes, <u>Harrell v. Beall</u>, 84 U.S. 590 (1873); <u>Shauer v. Alterton</u>,
151 U.S. 607, 621 (1894)).

Plaintiff argues that a transfer between spouses cannot *per se*
meet the definition of good faith while conceding such a *per se*
rule has never been established by any court.  (P's Post-Trial Mem.
at 37).  The issue of whether a spouse is *per se* capable of making
out a good faith defense has never even been squarely addressed by
a Connecticut court.  However, the issue appears to have been
passively considered and rejected at least at the trial court
level. <u>Quantam Sail Design Group, LLC</u>, 2004 U.S. Dist. LEXIS 9679,
at *9 n.1 ("The fact that the transferee and transferor in this

case are husband and wife has not been lost on the court. However, this fact alone does not provide grounds to deprive the transferee of the right to present a [good faith] defense."); Ann P. Coonley, P.C. v. Wright, CV020514382S, 2003 Conn. Super. LEXIS 1721, at *7 (Conn. Super. Ct. May 16, 2003)(implying that had the transferee spouse not admitted he knew of his wife's insolvency he would have been entitled to assert a good faith defense). With no evidence that such a rule exists, the court sees no reason to invent a *per se* rule prohibiting Lee White from asserting a good faith defense.

In order to defend against liability for the fraudulent transfer Lee White must not only prove "good faith", but must also prove she received "reasonably equivalent value." Conn. Gen. Stat. §52-552i(a).  Connecticut's UFTA defines value,

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Conn. Gen. Stat. §52-552d(a).  Thus, in order to succeed on this prong, the transferee must show that value, as defined by the statute, was received and that the value was reasonably equivalent to the property or obligation transferred.  Courts in this district applying Connecticut's UFTA as well as courts interpreting the UFTA in other jurisdictions have held value to mean the type of consideration capable of satisfying or partially satisfying a

creditor's claims. Cadle Co. v. Jones, No. 3:00cv316(WWE) (LEAD), 3:00cv317(WWE), 2004 U.S. Dist. LEXIS 18300 *17-18 (D. Conn. Aug. 20, 2004); Cadle Co. v. Ogalin (In re Ogalin), 303 B.R. 552, 559 (D. Conn. 2004); Maddox v. Robertson (In Re Prejean), 994 F.2d 706, 709 n.6 (9th Cir. 1993)(interpreting California's UFTA); Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.), 916 F.2d 528, 540 (9th Cir. 1990) (interpreting Hawaii's UFTA); Scholes v. African Enter. Inc., 854 F. Supp. 1315, 1328 (N.D. Ill. 1994)(interpreting Illinois' UFTA). Further, the drafters of the UFTA believed that value must be considered from the standpoint of the creditor, "Value is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition." Unif. Fraudulent Transfer Act § 3 cmt. 2 (internal quotations omitted). The court in Scholes aptly stated the policy reasons for defining "value" in relation to the creditor,

> Only consideration of substantially equivalent value leaves the debtor in a financially similar position after the conveyance. A conveyance made for consideration of nominal or no monetary value leaves the debtor in a much weakened financial position which hinders his creditors. This is precisely the scenario the statute attempts to prevent. Recognizing consideration of no monetary value as a defense to a fraudulent conveyance would emasculate the statute

854 F. Supp at 1328 (internal citations omitted). Thus, the court

concludes that Lee White cannot make out her affirmative defense unless she can show that she received the type of value that a creditor could utilize to satisfy its claim.

Considering now the case at hand, the court concludes that Lee White neither took with good faith nor did she receive reasonably equivalent value. With regard to the good faith requirement, Lee White cannot establish that the transaction was done at arms length. In fact, the transactions in question were the antithesis of the bargained for exchange usually associated with an arms-length deal. Here the transfers occurred between a husband and a wife. There was no bargaining, no negotiation, nothing that would liken this transaction to the typical contract between two people. Furthermore, the evidence is overwhelming that during the time period in question Lee White knew about her husband's financial difficulties. Between 1989 and 1990 Lee White personally co-signed loans to infuse cash into her husband's business. Moreover, by 1991 her husband's business had gone bankrupt and a property on which he was personally liable had been foreclosed. If Lee White did not know about her husband's financial problems it was out of complete willful blindness.

Lee White also cannot establish that she received reasonably equivalent value. The commentary and case law interpreting the UFTA makes clear that value must be something that a creditor can take in order to satisfy a debt. What was allegedly exchanged here

was a something of value in exchange for an implied promise. This promise was only valuable to Douglas White, it could not be taken and sold by a creditor. Thus, as the court noted in <u>Scholes</u>, the challenged transactions here are of the precise type the UFTA sought to remedy. Each and every transfer put Douglas White in a weaker financial position than he was before the transfer took place. Therefore, Douglas White did not receive reasonably equivalent value from Lee White in exchange for his commission checks. Because Lee White cannot show that she took with good faith and for reasonably equivalent value she cannot make out an affirmative defense against personal liability under the UFTA.

## B.    Constructive Fraud Counts

Plaintiff also brings two constructive fraud counts pursuant to Conn. Gen. Stat §§ 52-552e(a) and 52-552f(a). The statutes, in pertinent part, read as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation...(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Conn. Gen. Stat. 52-552e(a).

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the

transfer was made or the obligation was incurred if the
debtor made the transfer or incurred the obligation
without receiving a reasonably equivalent value in
exchange for the transfer or obligation and the debtor
was insolvent at that time or the debtor became insolvent
as a result of the transfer or obligation.

Conn. Gen. Stat. 52-552f(a).  The sections are identical in that

they do not require actual intent.  Instead, fraud is inferred when

a certain set of factual circumstances occur.  Further, both

sections require that the transferee received less than reasonably

equivalent value.[8]  The only substantive difference between the two

sections is the state of the transferor when the transfer is made.

Under 52-552e(a) the transferee must be currently involved in or

about to be involved in a venture that would leave the transferor

insolvent at some date in the future.  On the other hand, 52-

552f(a) requires that the transferor be insolvent at the time of

transfer or the transfer leaves the transferor insolvent.  If all

of the factual circumstances are present the transfer is deemed

fraudulent.

Plaintiff argues that it must prove the second and third

counts only by preponderance of the evidence rather than the clear

and convincing evidence standard.  Plaintiff contends that since

scienter is not required, there is no overriding policy reason for

_____

[8]

The analysis required to determine whether reasonably
equivalent value has been received under Conn. Gen. Stat. §§ 52-
552e(a), 52-552f(a) is identical to that of the affirmative
defense, Conn. Gen. Stat. § 52-552i(a), discussed infra at 21-24.

imposing a higher than normal standard. The argument is not without merit or support from courts interpreting the UFTA outside of Connecticut. See Bay State Milling Co. v. Martin, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992); Metro Shippers, Inc. v. Saviello, 78 B.R. 747, 751 (Bankr. E.D. Penn. 1987). However, the Connecticut Appellate Court has, on at least three separate occasions, stated that constructive fraud under Connecticut's version of the UFTA must be proven by clear and convincing evidence. Patrocinio v. Yalanis, 492 A.2d 215, 217 (Conn. App. Ct. 1985); Tessitore v. Tessitore, 623 A.2d 496, 498 (Conn. App. Ct. 1993); Dietter v. Dietter, 737 A.2d 926, 938 (Conn. App. Ct. 1999). If the burden of proof were dispositive, the court would be required to determine how the Connecticut Supreme Court would decide this issue. However, this discussion is unnecessary here because the court concludes that the plaintiff would prevail under either standard of proof.

For the reasons stated in the court's discussion on the intentional fraud count, the court finds that Cadle's claim arose before the challenged transfers and that Douglas White did not receive reasonably equivalent value. The only issue then is whether Douglas White was "engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably

should have believed that he would incur, debts beyond his ability to pay as they became due." Conn. Gen. Stat. § 52-552e(a).

The court finds that, when the transfers were made, Douglas White believed that he would incur debts beyond his ability to pay. For all intents and purposes defendant has stipulated to this finding. Mr. White stipulated that he retained only a small portion of his commissions, that his wife paid most of his business and personal expenses and that the value of the Cadle judgment far surpassed his yearly commissions. Thus, Douglas White has admitted that he is insolvent and that he regularly incurs debts which he personally will be unable to pay. Further, by January 24, 1998 Douglas White knew he was indebted to Cadle for a large sum of money and that the sum would significantly increase due to statutory interest. As a result, every time Mr. White signed over his commissions to his wife he knew he was hindering his ability to pay an ever increasing debt.

Likewise, the court finds in plaintiff's favor on count three. All three necessary prongs are present. Cadle's claim arose before the challenged transfers, Mr. White did not receive reasonably equivalent value and Mr. White became insolvent upon execution of each and every transfer.

### C.    Remedies

Under the Connecticut UFTA the transferee is liable for "the value of the asset transferred...or the amount necessary to satisfy

-28-

the creditor's claim, whichever is less.  Conn. Gen. Stat. § 52-552i(b).  Using this calculation on count one the court finds Lee White liable to plaintiff in the amount of $614,691.14[9] plus $88.29 per diem interest.  This number represents the amount necessary to satisfy Cadle's claim because it is less than the total value of the challenged transfers.  As explained earlier, the challenged transfers are valued between  $628,162.84 and $708.162.84.

The calculation is altered for counts two and three because plaintiff seeks only to invalidate transfers between January 24, 1998 and January 24, 2002.  The value of the transfers between these dates has been determined to be  $288,042.93 which is less than the amount necessary to satisfy Cadle's claim.  Therefore, on counts two and three the court finds Lee White liable for $288,042.93.

Because the amount awarded in count one represents Cadle's entire claim, adding the awards from counts two and three would be unfair and duplicative.  The UFTA is designed to provide creditors with an avenue through which to obtain full satisfaction of their claims, not to award windfall damages for successfully litigating alternative theories of liability.  In order to avoid this windfall

---

[9]

On August 9, 2004 the parties stipulated that the amount Douglas White owed Cadle was $562,776.62.  The parties further stipulated that $88.29 per diem interest would apply to this amount.  By the court's calculation 588 days have passed since the date of the stipulation.  As a result, $51,914.52 in interest should be applied to the stipulated amount.

the court issues a monetary judgment on count one only.

The court is also authorized under the UFTA to issue "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property." Conn. Gen. Stat. §52-552h(a)(3)(A). An injunction against both defendants is appropriate in this case. Defendant Douglas White is permanently enjoined from depositing any cash, check or other form of remuneration into any account in which he is not an owner or joint owner. It should be made clear to the defendant that continuing to deposit commission checks into his wife's account will be a direct violation of a court order. Likewise, Lee White is permanently enjoined from accepting any cash, check or other funds from Douglas White for the purpose of depositing the funds into any account in which Douglas White is not at least a joint-owner.

The court concludes that, on the present record, only the monetary and injunctive relief is appropriate. If plaintiff wishes to move for further relief it must do so within 30 days of this ruling.

### IV.  Conclusion

For the reasons stated in this ruling the court finds in favor of the plaintiff on all counts. **JUDGMENT** is entered, as of March 21, 2006, against both defendants in the amount of **$614,691.14** with *per diem* interest in the amount of $88.29 to be applied until the

judgment is satisfied.  Further, an injunction is hereby entered prohibiting defendants from future like transfers.  The defendants are **ORDERED** to immediately cease and desist from continuing to transfer assets from Douglas White to Lee White's exclusive ownership.  Any future transfers of the type invalidated in this ruling will be a violation of this order.

This case is before the undersigned pursuant to  28 U.S.C. § 636(c) and D. Conn. Magis. R. 73(A)(1).  As such, this is a final ruling directly appealable to the United States Court of Appeals for the Second Circuit.  28 U.S.C. § 636(c)(3); D. Conn. Magis. R. 73(B)(1).


**IT IS SO ORDERED.**

**Dated at Hartford, Connecticut this 21ˢᵗ day of March, 2006.**


**/s/ Thomas P. Smith**
**Thomas P. Smith**
**United States Magistrate Judge**